# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| 8061 Cherrystone Ave., Panorama City, California 91402 | ) ) ) ) | Case No.  2:23-mj-02978 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1960 | Operation of an Unlicensed Money Transmission Business |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Jesse Tracy*
_____
Applicant's signature

Jesse Tracy, HSI Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
Judge's signature

City and state: Los Angeles, CA

Hon. Rozella A. Oliver, U.S. Magistrate Judge
_____
Printed name and title

AUSA: Kyle W. Kahan (x2238) for SDCA AUSA Carl Brooker (619) 546-7994

## **ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises located at 8061 Cherrystone Ave., Panorama City, California 91402 (the "**SUBJECT PREMISES**").

The **SUBJECT PREMISES** is a beige stucco building with white trim around the windows and eaves.  It has a white front door and black shingle asphalt roof.  It is separated from the driveway of a separate dwelling on the same lot, namely, 8059 Cherrystone Ave., by a white gate.  Photographs of the exterior and an aerial view of **SUBJECT PREMISES** are below:



**ATTACHMENT B**

**I.**   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1960 (Operation of an Unlicensed Money Transmission Business), and 371 (Conspiracy) (the "Subject Offenses"), namely:

a.   Any and all cryptocurrency, to include the following:

i.   any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

ii.   any and all representations of cryptocurrency private keys, whether in electronic or physical format;

iii. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

b.   The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

c.   All documents and records indicating control for, ownership of, and financial and transactions by **POGOSIAN**, David Scotese Kimberlee Scotese, "LetterGuy21969," LocalMonero.co, and MoneroLA.

d.   All documents and records related to the transport of goods or currency on behalf of, or in connection with, **POGOSIAN**,

David       Scotese,       Kimberlee       Scotese,       LocalMonero.co,
"LetterGuy21969," and MoneroLA.

e.   All documents and records related to payment for
merchandise, or other documents and records showing charges to
customers and payments from customers for the purchase of virtual
currency, and other services provided by **POGOSIAN**, David Scotese,
Kimberlee Scotese, "LetterGuy21969," LocalMonero.co, and MoneroLA,
and the businesses they manage or direct.

f.   Any and all gold and silver bars or coins or loose
diamonds or previous stones or similar items used for storing of
value outside of the conventional financial system. This list at
subsection (f) does not include jewelry.

g.   All documents, records, and items related to
passwords, password files, test keys, encryption codes, or other
information necessary to access computer files, computer software,
storage devices, digital wallets or funds, or other password-
protected data.

h.   All documents and records of **POGOSIAN**, David
Scotese, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and
MoneroLA accounting records related to income, expenses, loans,
notes, equity, retained earnings, profit, loss, balance sheets,
financial summaries or worksheets, cash receipts, disbursements,
imports, or exports, or financial transactional history.

i.   All documents and records related to **POGOSIAN**,
David       Scotese,       Kimberlee       Scotese,       LocalMonero.co,
"LetterGuy21969,"  and  MoneroLA's  international  and  domestic

financial transactions, at, with, or through domestic or foreign financial institutions.

j. All documents and records of **POGOSIAN**, David Scotese, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA's accounting records related to income, expenses, loans, notes, equity, retained earnings, profit, loss, balance sheets, financial summaries or worksheets, cash receipts, disbursements, imports, or exports, or financial transactional history.

k. All documents and records related to the identification of, solicitation of, communications with, and transactional history with current, former, and prospective customers and their interactions, transactions, agreements, or financial dealings with **POGOSIAN**, David Scotese, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA.

2. As used throughout this Attachment B, the terms "items," "documents", and "records" include all of the following items of evidence in whatever form, including all temporary and permanent electronic files and records, and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including thumb drives, hard disks, ZIP disks, CD-ROMs, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photocopies).

a.    Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than POGOSIAN and/or David Scotese, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.    Records, documents, programs, applications, or materials pertaining any bank accounts, credit card accounts, or other financial accounts, including applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

c.    Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

d.    Records, documents, programs, applications, or materials relating to United States mail or mail matter;

e.    U.S. currency in excess of $1,000, including the first $1,000 if more than $1,000 is recovered, bearer instruments worth over $1,000 (including cashier's checks and traveler's checks), and precious stones worth more than $1,000;

f.    Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

v

g.   Any documents or records, including receipts, invoices, bank statements, and credit card statements, evidencing the purchase of any products or services using altered, counterfeit, or fraudulent or unauthorized checks, access devices, or other monetary instruments;

h.   Any products, goods, or merchandise purchased with fraudulent or unauthorized checks, access devices, or other monetary instruments;

i.   Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of, POGOSIAN and/or David Scotese;

j.   Any tools or equipment, such as computers, software, printers, scanners, embossing machines, credit card readers or encoders, washing chemicals, or imprinting tools, used or intended to be used to alter, counterfeit, or create fraudulent checks, access devices, or other monetary instruments;

k.   Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

l.   Indicia of occupancy, residency or ownership of the **SUBJECT PREMISES** and things described in the warrant, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

m.   Contents of any calendar or date book stored on any of the digital devices;

n.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

o.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

p.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

q.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

r.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

s.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

t.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

u.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

5.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

x

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

xii

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress **POGOSIAN's** thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of **POGOSIAN's** face with his or her eyes open to activate

xiii

the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Jesse Tracy, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application for a warrant to search the residence of 8061 Cherrystone Ave., in Panorama City, California 91402, believed to be the residence of Levon Pogosian ("**POGOSIAN**") as described in Attachment A.

2.   The requested warrant to search the premises described in Attachment A seeks authorization to seize evidence, fruits, or instrumentalities of violations of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. § 1960, and Conspiracy, in violation of 18 U.S.C. § 371 (the "Subject Offenses"), being committed by **POGOSIAN**, and others known and unknown, as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II.   BACKGROUND OF AGENT

4.   I am a Special Agent and currently employed with the United States Department of Homeland Security, Immigration and

1

Customs Enforcement, Homeland Security Investigations ("HSI"). I have held my current position with HSI since July 2017. I am a graduate of the Criminal Investigator Training Program and the Immigration and Customs Enforcement Special Agent Training Program at the Federal Law Enforcement Training Center ("FLETC"). During the course of my training at FLETC, I learned the fundamentals of criminal investigations including, but not limited to, preparing arrest warrants and search warrants, gathering of evidence, preserving crime scenes, and using electronic evidence – all in relation to violations of the United States Code.

5. From May 2007 to July 2017, I was employed as a full-time, sworn federal agent with the U.S. Border Patrol ("USBP"). For a portion of my Border Patrol Agent career, I was assigned to the San Diego Sector Smuggling Interdiction Group Special Case Unit.

6. I am currently assigned to a Financial Investigations Group of the Office of the HSI Special Agent in Charge, San Diego, California, and have been since starting with HSI in July 2017. Throughout my federal career, I have conducted multiple criminal investigations into violations of federal and state law including, but not limited to, money laundering, bulk cash smuggling, contraband smuggling, narcotics trafficking, weapons violations, and organized criminal activity. Furthermore, as a federal law enforcement officer, I have submitted affidavits in support of search warrant applications and have been granted search warrants, including search warrants for residences and

2

electronic devices.  I have also personally caused the issuance and service of subpoenas in furtherance of criminal investigations and have received and reviewed records in response to the issuance of said subpoenas.

### III. SUMMARY OF PROBABLE CAUSE

7.  Since January 2023, the HSI has been investigating Levon Pogosian ("**POGOSIAN**") for advertising his services on the dark web offering to exchange fiat currency for Monero (XMR), an untraceable virtual currency.  HSI engaged **POGOSIAN** under his dark web moniker "MoneroLA" on multiple occasions in the Southern District of California, wherein **POGOSIAN** exchanged approximately $262,000 of US currency for Monero.  **POGOSIAN** would take an 8 to 10 percent fee to conduct the transaction. At no point during these exchanges was **POGOSIAN** licensed with FinCEN as a money services business.

8.  On June 7, 2023, the Honorable Judge Alka Sagar issued a premises search warrant for 8059 Cherrystone Ave., Panorama City, California 91402 in Case Number 2:23-MJ-2914.  The Honorable Judge Sagar also issued search warrants for a vehicle tied to **POGOSIAN,** and a vehicle and premises warrant tied to a co-conspirator, David Scotese, in Case Numbers 2:23-MJ-2915, 2:23-MJ-2916, and 2:23-MJ-2921, for evidence, fruits, or instrumentalities of violations of the Subject Offenses.

9.  On June 9, 2023, Special Agents from HSI executed the warrants, including the search of 8059 Cherrystone Ave., Panorama City, California 91402.  Upon execution of the warrant at that address, HSI Special Agents discovered evidence in the

residence directly linking **POGOSIAN** to 8061 Cherrystone Ave. in Panorama, California, an adjacent dwelling on the same lot as 8059 Cherry Stone Ave.  HSI Special Agents also observed official mail from the United States government addressed to **POGOSIAN** at the 8061 Cherrystone Ave. address.

## IV.  STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

11. On June 7, 2023, the Honorable Judge Alka Sagar issued a premises search warrant for 8059 Cherrystone Ave., Panorama City, California 91402 in Case Number 2:23-MJ-2914 for evidence, fruits, or instrumentalities of violations of the Subject Offenses.  The affidavit in support of the warrant in case number 2:23-MJ-2915 is attached hereto as **Exhibit 1** and incorporated herein by reference.

12. As described more fully in **Exhibit 1, POGOSIAN** advertised his services on the dark web to exchange fiat currency for Monero (XMR), an untraceable virtual currency.  HSI engaged **POGOSIAN** under his dark web moniker "MoneroLA" and meth with **POGOSIAN** on multiple occasions in the Southern District of California, wherein **POGOSIAN** exchanged approximately $262,000 of US currency for Monero.  **POGOSIAN** would take an 8 to 10 percent fee to conduct the transaction.  At no point during these exchanges was **POGOSIAN** licensed with FinCEN as a money services business.  **POGOSIAN** was linked to 8059 Cherrystone Ave., Panorama City, California 91402 based on a review of law

4

enforcement databases, ties to his father Karen Pogosian --- who is the registered owner of a vehicle used by **POGOSIAN** to effectuate the above-mentioned transactions, and California DMV records.

13. As described more fully in **Exhibit 1**, the lot on which 8059 Cherrystone Ave., Panorama City, California 91402 is built on also contains a separate dwelling located in the rear of the lot that is separated by a white gate with an address of 8061 Cherrystone Ave., Panorama City, California 91402, i.e., the **SUBJECT PREMISES.**

14. I have reviewed recent utility records for the **SUBJECT PREMISES,** which indicate that **POGOSIAN** has utilities associated with the **SUBJECT PREMISES.**

15. Upon execution of the warrant at 8051 Cherrystone Avenue, HSI Special Agents encountered **POGOSIAN's** mother and observed evidence in 8059 Cherrystone Ave. directly linking **POGOSIAN** to the **SUBJECT PREMISES.**  Specifically, HSI Special Agents observed official mail from the United States government addressed to **POGOSIAN** at the **SUBJECT PREMISES.**

16. The same day HSI Special Agents executed an arrest warrant on **POGOSIAN** for violations 18 U.S.C. § 1960 (Operation of an Unlicensed Money Transmission Business) arising out of the conduct in **Exhibit 1.**  HSI Special Agents asked **POGOSIAN** for his personal identifying information.  **POGOSIAN** stated that he lived at the **SUBJECT PREMISES.**

###### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

17.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

18. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **POGOSIAN's** thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **POGOSIAN's** face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.   TRAINING AND EXPERIENCE ON VIRUTAL CURRENCY AND ENCRYPTION

93. Based on my training and experience, I know that individuals involved in fraudulent activities often maintain records (including financial records, receipts, notes, ledgers, mail, tax records, and other papers) related to their crimes,

and that these records are often maintained at places where the individuals can have ready access to them, including their residence.  In my training and experience, I also know that individuals who have committed crimes using computers or digital devices, such as **POGOSIAN**, often keep records of their crimes in digital or electronic format, such as on a computer, and that computers are often stored in a residence.

94.  It should be noted that because **POGOSIAN's** crimes involved the use of virtual currency and encryption, the items to be seized could be stored almost anywhere within a residence, in both physical and electronic formats.  For example, Attachment B seeks crypto- and virtual currency addresses, private keys, root keys, PGP keys, and passwords.  These pieces of data comprise long and complex character strings, and in my training and experience I know that many virtual currency users write down or otherwise record and store such items because they are too long to commit to memory.  As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence.  For all of the foregoing reasons, your affiant respectfully submits that probable cause exists to believe that such records, data, and documents will be found within **POGOSIAN's** residence, including in computers or on other devices that store electronic data.

## VII. CONCLUSION

95.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations

of the Subject Offenses will be found at and in the **SUBJECT PREMISE**, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 9th day of June,
2023.

_____
THE HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

# Exhibit 1

AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | FILED |
| --- | --- | --- |

<table>
<tr><td>In the Matter of the Search of</td><td>)</td><td></td></tr>
<tr><td rowspan="2">8059 Cherrystone Ave., Panorama City, California 91402</td><td>)</td><td rowspan="2">Case No.  2:23-MJ-02914</td></tr>
<tr><td>)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

**FILED**
CLERK, U.S. DISTRICT COURT

June 7, 2023

CENTRAL DISTRICT OF CALIFORNIA
BY:_____CLD_____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1960 | Operation of an Unlicensed Money Transmission Business |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

*/s/ Jesse Tracy*
_____
Applicant's signature

Jesse Tracy, HSI Special Agent
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  June 7, 2023
_____
Judge's signature

City and state: Los Angeles, CA
_____
Honorable Alka Sagar, U.S. Magistrate Judge
Printed name and title

AUSA: Kyle W. Kahan (x2238) for SDCA AUSA Carl Brooker (619) 546-7994

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises located at 8059 Cherrystone Ave., Panorama City, California 91402 ("**SUBJECT PREMISES 1**").

**SUBJECT PREMISES 1** is a single-family residence located within the city boundaries of Panorama City, California.  The residence is comprised of 8059 Cherrystone Ave.  **SUBJECT PREMISES 1** is two-unit single-story family home dwelling with a recessed street level, multi vehicle secure parking area behind a rolling security gate.  The street address "8059/8061" is clearly affixed on the front face of the structure on the top right corner of the home facing the street.  The structure is beige-colored stucco.  The main front door provides access to 8059 Cherrystone Avenue's single-family dwelling located in the front portion of the lot, facing Cherrystone Avenue.  There is a white metal gate immediately to the left of the residence facing Cherrystone Ave.  The street-level gated parking area is recessed from the street secured with a rolling metal gate allowing parking for four vehicles.  On the sidewalk on Cherrystone Avenue in the front of **SUBJECT PREMISES 1** is a walkway that leads to the main front door and recessed parking area.  There are additional gates to the left and right of **SUBJECT PREMISES 1** allowing access to a rear dwelling on the same lot listed as 8061 Cherrystone Avenue.  The rear dwelling is a separate address and not attached to **SUBJECT PREMISES 1.** Photographs of the exterior and an aerial view of **SUBJECT PREMISES 1** are below:







**ATTACHMENT A-2**

PREMISES TO BE SEARCHED

The premises located at 34454 Bloomberry Road, Murrieta, California 92563 ("**SUBJECT PREMISES 2**").

**SUBJECT PREMISES 2** is a single-family dwelling located within the city boundaries of Murrieta, California.  The street address "34454" is clearly affixed on the left front face of the structure on the top left corner of the home facing the street. The structure is beige-colored stucco with rock facing on the lower portion of the exterior.  The main front door provides access to 34454 Bloomberry's single-family dwelling in the center of the home with the garage door to the left of the front door.  On the sidewalk on Bloomberry Road in the front of **SUBJECT PREMISES 2** is a walkway that leads to the residence's front door. Photographs of the exterior and an aerial view of **SUBJECT PREMISES 2** are below:





## **ATTACHMENT A-3**

<u>PROPERTY TO BE SEARCHED</u>

A white 2021 Toyota Corolla bearing California license plate 8WOJ883 and Vehicle Identification Number (VIN) 5YFS4MCE6MP086096 ("**SUBJECT VEHICLE 1**").

**ATTACHMENT A-4**

PROPERTY TO BE SEARCHED

    A maroon 2013 Honda Accord bearing California license plate number 7JD298 and Vehicle Identification Number (VIN) 1HGCR2F82DA179476 ("**SUBJECT VEHICLE 2**").

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1960 (Operation of an Unlicensed Money Transmission Business), and 371 (Conspiracy) (the "Subject Offenses"), namely:

a.   Any and all cryptocurrency, to include the following:

i.   any and all representations of cryptocurrency public keys or addresses, whether in electronic or physical format;

ii.  any and all representations of cryptocurrency private keys, whether in electronic or physical format;

iii. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

b.   The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

c.   All documents and records indicating control for, ownership of, and financial and transactions by POGOSIAN, SCOTESE Kimberlee Scotese, "LetterGuy21969," LocalMonero.co, and MoneroLA.

d.   All documents and records related to the transport of goods or currency on behalf of, or in connection with, POGOSIAN,

SCOTESE, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA.

e.   All documents and records related to payment for merchandise, or other documents and records showing charges to customers and payments from customers for the purchase of virtual currency, and other services provided by POGOSIAN, SCOTESE, Kimberlee Scotese, "LetterGuy21969," LocalMonero.co, and MoneroLA, and the businesses they manage or direct.

f.   Any and all gold and silver bars or coins or loose diamonds or previous stones or similar items used for storing of value outside of the conventional financial system. This list at subsection (f) does not include jewelry.

g.   All documents, records, and items related to passwords, password files, test keys, encryption codes, or other information necessary to access computer files, computer software, storage devices, digital wallets or funds, or other password-protected data.

h.   All documents and records of POGOSIAN, SCOTESE, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA accounting records related to income, expenses, loans, notes, equity, retained earnings, profit, loss, balance sheets, financial summaries or worksheets, cash receipts, disbursements, imports, or exports, or financial transactional history.

i.   All documents and records related to POGOSIAN, SCOTESE, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA's international and domestic financial transactions, at, with, or through domestic or foreign financial institutions.

j.   All documents and records of POGOSIAN, SCOTESE, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA's accounting records related to income, expenses, loans, notes, equity, retained earnings, profit, loss, balance sheets, financial summaries or worksheets, cash receipts, disbursements, imports, or exports, or financial transactional history.

k.   All documents and records related to the identification of, solicitation of, communications with, and transactional history with current, former, and prospective customers and their interactions, transactions, agreements, or financial dealings with POGOSIAN, SCOTESE, Kimberlee Scotese, LocalMonero.co, "LetterGuy21969," and MoneroLA.

2.   As used throughout this Attachment B, the terms "items," "documents", and "records" include all of the following items of evidence in whatever form, including all temporary and permanent electronic files and records, and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including thumb drives, hard disks, ZIP disks, CD-ROMs, personal digital assistants, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photocopies).

a.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing,

using, or transferring personal and/or financial transaction identification information for persons other than POGOSIAN and/or SCOTESE, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

      b.   Records, documents, programs, applications, or materials pertaining any bank accounts, credit card accounts, or other financial accounts, including applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

      c.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

      d.   Records, documents, programs, applications, or materials relating to United States mail or mail matter;

      e.   U.S. currency in excess of $1,000, including the first $1,000 if more than $1,000 is recovered, bearer instruments worth over $1,000 (including cashier's checks and traveler's checks), and precious stones worth more than $1,000;

      f.   Any altered, counterfeit, or fraudulent identifications, checks, access devices, monetary instruments, or other official documents;

      g.   Any documents or records, including receipts, invoices, bank statements, and credit card statements, evidencing the purchase of any products or services using

altered, counterfeit, or fraudulent or unauthorized checks, access devices, or other monetary instruments;

      h.   Any products, goods, or merchandise purchased with fraudulent or unauthorized checks, access devices, or other monetary instruments;

      i.   Any identifications, checks, access devices, monetary instruments, or other official documents that are not addressed to, or in the name of, POGOSIAN and/or SCOTESE;

      j.   Any tools or equipment, such as computers, software, printers, scanners, embossing machines, credit card readers or encoders, washing chemicals, or imprinting tools, used or intended to be used to alter, counterfeit, or create fraudulent checks, access devices, or other monetary instruments;

      k.   Records of off-site storage locations, including safe-deposit box keys, records, receipts, or rental agreements for storage facilities;

      l.   Indicia of occupancy, residency or ownership of the **SUBJECT PREMISES** and/or **SUBJECT VEHICLES** and things described in the warrant, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents, keys, letters, mail, canceled mail envelopes, or clothing;

      m.   Contents of any calendar or date book stored on any of the digital devices;

n.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

o.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

p.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

q.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

r.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

s.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter,

whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

t.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

u.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.  records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**II.  SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

5.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.  Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.  Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.  Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress **POGOSIAN** and/or **SCOTESE's** thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of **POGOSIAN** and/or **SCOTESE's** face

with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Jesse Tracy, being duly sworn, declare and state as follows:

### I. <u>INTRODUCTION</u>

1.    I am a Special Agent and currently employed with the
United States Department of Homeland Security, Immigration and
Customs Enforcement, Homeland Security Investigations ("HSI"). I
have held my current position with HSI since July 2017.  I am a
graduate of the Criminal Investigator Training Program and the
Immigration and Customs Enforcement Special Agent Training Program
at the Federal Law Enforcement Training Center ("FLETC").  During
the course of my training at FLETC, I learned the fundamentals of
criminal investigations including, but not limited to, preparing
arrest warrants and search warrants, gathering of evidence,
preserving crime scenes, and using electronic evidence – all in
relation to violations of the United States Code.

2.    From May 2007 to July 2017, I was employed as a full-time,
sworn federal agent with the U.S. Border Patrol ("USBP").  For a
portion of my Border Patrol Agent career, I was assigned to the San
Diego Sector Smuggling Interdiction Group Special Case Unit.

3.    I am currently assigned to a Financial Investigations
Group of the Office of the HSI Special Agent in Charge, San Diego,
California, and have been since starting with HSI in July 2017.
Throughout my federal career, I have conducted multiple criminal
investigations into violations of federal and state law including,
but not limited to, money laundering, bulk cash smuggling,
contraband smuggling, narcotics trafficking, weapons violations, and
organized criminal activity.  Furthermore, as a federal law

enforcement officer, I have submitted affidavits in support of
search warrant applications and have been granted search warrants,
including search warrants for residences and electronic devices.  I
have also personally caused the issuance and service of subpoenas in
furtherance of criminal investigations and have received and
reviewed records in response to the issuance of said subpoenas.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.   This affidavit is made in support of warrants to
search the following:

a.   the residence of 8059 Cherrystone Ave., in
Panorama City, California 91402, believed to be the residence of
Levon Pogosian ("**POGOSIAN**") **("SUBJECT PREMISES 1"**), as described
in Attachment A-1;

b.   the residence of 34454 Bloomberry Road, in
Murrieta, California, 92563, believed to be the residence of
David Scotese ("**SCOTESE**") ("**SUBJECT PREMISES 2**") (collectively
with **SUBJECT PREMISES 1**, the "**SUBJECT PREMISES**"), as further
described in Attachment A-2;

c.   a white 2021 Toyota Corolla bearing California
License Plate 8WOJ883, believed to be used by **POGOSIAN** ("**SUBJECT
VEHICLE 1**"), as further described in Attachment A-3; and

d.   a maroon 2013 Honda Accord bearing California
license plate 7DJD298, believed to be used by **SCOTESE** ("**SUBJECT
VEHICLE 2**") (collectively with **SUBJECT VEHICLE 1**, the "**SUBJECT
VEHICLES**"), as further described in Attachment A-4.

5.   The requested warrants to search the premises and
property described in Attachments A-1 through A-4, seek

authorization to seize evidence, fruits, or instrumentalities of violations of Operation of an Unlicensed Money Transmission Business, in violation of 18 U.S.C. § 1960, and Conspiracy, in violation of 18 U.S.C. § 371 (the "Subject Offenses"), being committed by **POGOSIAN** and **SCOTESE,** and others known and unknown, as described more fully in Attachment B.  Attachments A-1 through A-4 and B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III. <u>OVERVIEW OF INVESTIGATION</u>

7.    HSI actively operates personas on the dark web to infiltrate and exploit criminal organizations involved in the unlicensed exchange and transmission of cryptocurrencies to either other cryptocurrencies or fiat "cash" currency.  HSI has been monitoring many of the websites used to exchange virtual- and cryptocurrency anonymously – in essence dark web Craigslist for unlicensed money exchangers.

8.    In early 2023, HSI observed an individual known as

"MoneroLA" — later identified as Levon Pogosian ("**POGOSIAN**") — advertise his services on the LocalMonero.co exchange offering to exchange fiat currency for Monero (XMR), an untraceable virtual currency. HSI engaged "MoneroLA" and on multiple occasions in the Southern District of California, HSI undercover agents ("UC") exchanged $262,000 of US currency for Monero with **POGOSIAN** who charged a fee between 8 to 10 percent to conduct the transaction. **POGOSIAN** is not licensed with FinCEN as a money services business.

9.   On March 30, 2023, upon conclusion of yet another undercover buy between HSI UCs and **POGOSIAN, POGOSIAN** departed the meeting location in **SUBJECT VEHICLE 1** and drove to Murietta, California. **POGOSIAN** arrived at the Victory Park, Valley-Wide Recreation and Park District in Murietta, California. **POGOSIAN** and an unknown man were observed waiting in **SUBJECT VEHICLE 1**. Approximately 15 minutes after **SUBJECT VEHICLE 1**'s arrival, a white 2021 Tesla sedan (the "Tesla") bearing California license plate 8VIP470 arrived and parked next to **POGOSIAN. POGOSIAN** left **SUBJECT VEHICLE 1** and entered the Tesla. **POGOSIAN** remained inside the Tesla for approximately 10 minutes before leaving. Shortly thereafter, the Tesla drove away from the park.  HSI Special Agents positively identified Kimberlee Scotese, David Scotese's ("**SCOTESE**") spouse, as the passenger inside the Tesla.

10.  On April 14, 2023, following one exchange in the Southern District of California, **POGOSIAN** transported the US Currency to a park in the Central District of California using **SUBJECT VEHICLE 1**.  HSI Agents then observed **SCOTESE** leave

SUBJECT PREMESIS 2 in SUBJECT VEHICLE 2.  SCOTESE arrived at the same park and parked next to SUBJECT VEHICLE 1.  SCOTESE left SUBJECT VEHICLE 2 and reentered SUBJECT VEHICLE 1.

11.  POGOSIAN and SCOTESE remained inside SUBJECT VEHICLE 1 for approximately 20 minutes.  Inside, SCOTESE was observed counting money with POGOSIAN and talking before leaving carrying the same bag the UCs had provided POGOSIAN during the days earlier UC transaction.  SCOTESE drove away from the park in SUBJECT VEHICLE 2 and returned to SUBJECT PREMISES 2 approximately three minutes later.  As he got out of SUBJECT VEHICLE 2, SCOTESE was carrying the same bag containing currency previously provided to POGOSIAN during the UC meet.  SCOTESE then entered SUBJECT PREMISES 2 carrying the bag.

12.  Based on the observed link to POGOSIAN, HSI has also conducted an investigation into and surveilled SCOTESE.  This investigation has established that SCOTESE operates an open unlicensed money transmission business.  For instance, on May 5, 2023, HSI undercover agents exchanged $60,000 of US currency for Monero with SCOTESE who charged approximately 4 points.  SCOTESE is not licensed with FinCEN as a money transmission service.  During SCOTESE's May 5, 2023 unlicensed money transmission, he was observed utilizing both SUBJECT VEHICLE 2 and SUBJECT PREMESIS 2 to engage in the illegal activity. For example, during the May 5, 2023 transaction, SCOTESE told UCs he would exchange $10,000 first and verify the money at his home with his money counter before returning to do the remaining $50,000.  Subsequently, after accepting nearly $10,000 of the

approximately $60,000 transaction, SCOTESE left the meeting location in **SUBJECT VEHICLE 2** and returned to **SUBJECT PREMISES 2**. After a brief period, SCOTESE left **SUBJECT PREMISES 2** and drove back to Victory Park using **SUBJECT VEHICLE 2** to complete the remainder of the $50,000 transaction. **SCOTESE** is not licensed with FinCEN as a money services business.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.  Background on Money Transmitting Businesses**

13.  Licensed money exchangers (including those that exchange cash for virtual currency) are required by law to follow Bank Secrecy Act (the "BSA," at Title 31, United States Code, Sections 5311 *et seq*.) and the BSA's implementing anti-money laundering ("AML") regulations, such as identifying persons involved in large currency transactions.  Unlicensed money exchangers, money transmission businesses (an "MTB"), and money services businesses (an "MSB") do not adhere to such laws and regulations.  A customer seeking to exchange virtual currency such as Monero for cash can contact persons acting as unlicensed money exchangers or transmitting businesses on dark web Internet-based exchange platforms such as www.localmonero.co.

14.  Based on my training and experience, some customers seek to avoid the AML scrutiny of depository banks, or other BSA-compliant financial institutions, like casinos and MTBs.  Electronic or check transfers between bank accounts, or other transfers through an MSB/MTB that is registered with the United States government are transparent and subject to scrutiny.  As required under the BSA, licensed MTBs are required by federal statutes and regulations to

maintain an adequate AML program, which requires, among other
policies and procedures, identifying and reporting persons
conducting suspicious transactions.  Similarly, as a financial
institution, an MTB must prepare and submit CTRs (discussed in more
detail below) to the Secretary of Treasury on certain cash
transactions. An MSB/MTB, whether licensed or not, must adhere to
such laws and regulations.

15.  On March 18, 2013, the Department of the Treasury's
Financial Crimes Enforcement Network ("FinCEN") issued guidance on
the MSB/MTB registration obligations for persons and businesses
involved in converting and exchanging virtual currencies. FinCEN
concluded that "exchangers" – that is, persons engaged as a business
in the exchange of virtual currency for real currency, funds, or
other virtual currency are considered money transmitters subject to
the MSB/MTB registration, reporting, and recordkeeping regulations
under Title 31, United States Code, Section 5330.  On the other
hand, "users" – persons who merely obtain virtual currency to
purchase goods or services – are not money transmitters.

16.  It is a violation of Title 18, United States Code, Section
1960 to knowingly conduct, control, manage, supervise, direct, or
own all or part of an unlicensed MTB.  Title 18, United States Code,
Section 1960(b)(1)(A)/(B) defines an unlicensed MTB to include one
that is either "operated without an appropriate money transmitting
license in a State where such operation is punishable as a
misdemeanor or a felony under State law, whether or not the
defendant knew that the operation was required to be licensed or
that the operation was so punishable" or, "a money transmitting

7

business which affects interstate or foreign commerce in any manner or degree and fails to comply with the money transmitting business registration requirements under section 5330 of Title 31, United States Code, or regulations prescribed under such section."

17. As of May 18, 2023, **POGOSIAN** and **SCOTESE** have not registered themselves or their MTBs, nor do they comply with the regulations prescribed under Title 31, United States Code, Section 5330. Based on the evidence described below, there is probable cause to believe that **POGOSIAN** has been operating a commercial enterprise since no later than February 21, 2023 (when **POGOSIAN** created and began operating his MTB on Localmonero.co), and that **SCOTESE** has been operating a commercial enterprise since no later than December 30, 2022 (when **SCOTESE** created and began operating his MTB on Localmonero.co), which at all times since has been willing and able to transfer funds on behalf of the public, as an unlicensed MTB, in violation of Title 18, United States Code, Section 1960. Accordingly, it is believed that persons have availed themselves of **POGOSIAN's** unlicensed MTB, and those persons have been able to (i) avoid domestic financial institutions from filing CTRs and other reports of suspicious transactions, both required by Title 31, United States Code and the regulations prescribed thereunder, as well as (ii) conduct transactions anonymously.

**B. Background on the Dark Web, Monero, and Virtual/Crypto Currency**

18. Based on my training experience, and knowledge of this case, I know that an additional way to maintain anonymity for virtual currency transactions is to buy and sell on the "dark web."

Illicit substances acquired through transactions on the dark web are purchased almost exclusively with virtual currency.  The dark web was created as a network of communications systems that provides users anonymity and can only be accessed using special software tools such as the "Tor Browser," also known as The Onion Router.  These platforms primarily serve two purposes: connecting users anonymously to the Open Web; and providing access to the dark web where content is intentionally hidden and inaccessible through standard Web browsers.  The dark web connects users to destination servers through a series of hops, each of which is encrypted, ensuring that no single relay point can identify both the user and their destination.

19.  Monero is a private virtual currency online payment system in which the denomination of the virtual currency is the Monero.  As stated on its website, which I have reviewed, the question of "What is Monero?" is a "[p]rivate, decentralized cryptocurrency that keeps your finances confidential and secure."  The website further explains that Monero is transferred through computers and cell phones as follows:

> To use Monero, the first thing you are going to need is a wallet.  After you install a wallet, you need to get some Monero.  There are multiple ways to acquire some coins to spend, like mining or working in exchange for Monero, but the easiest way is to use an exchange and convert your fiat money into XMR. Many exchanges, centralized and decentralized, list Monero (XMR).

20.  A Monero virtual currency "wallet" is a digital file that stores the virtual currency.  It can be expressed in a unique string of characters, some as many as 95 characters starting with a "4" or

an "8", or as a QR Code, which a mobile phone can scan to retrieve the virtual wallet location.

21.   Monero and other virtual currencies are accepted methods of payment for a variety of goods and services, both legal and illegal.  Virtual currency gives the vendor and customer perceived anonymity, much like cash, but with greater flexibility and security.  Based on my training, experience, and knowledge of related criminal activity, persons who purchase illegal drugs on online black markets on the dark web use virtual currency such as Monero to complete transactions.  However, before customers can use virtual currency, they must first convert their "real," fiat currency (such as United States Dollars), into the virtual currency, such as Bitcoin.  Customers can next exchange the Bitcoin for Monero.  The most common way to exchange fiat currency for cryptocurrency or to exchange cryptocurrency for a different cryptocurrency is through an online MSB/MTB that exchanges virtual currency.  If a customer wants to avoid the "know-your-customer" ("KYC") scrutiny of a registered MSB/MTB, they then turn to dark web sites such as Localmonero.co.

**C.   Background on Localmonero.co**

22.   Localmonero.co is an online cryptocurrency exchange website and is accessed via the standard internet, not the dark web. Localmonero.co advertises on its website that "the best cryptocurrency to invest in is [Monero].  Monero is an untraceable coin developed with privacy by design in mind."

23.   Through its online website, Localmonero.co offers two different services to buyers and sellers of Monero.  First, they

10

offer "online trades" whereby Localmonero.co functions as a trading platform with an escrow function. Per Localmonero.co's website, "[o]nline trades occur online entirely through our trading platform without you ever meeting your trading partner." The second service offered by Localmonero.co, and the one at issue in this instance, is their "local trade" program. Through this 'local trade' program, Localmonero.co facilitates the scheduling of an in-person face-to-face meet of an individual looking to trade Monero and an individual looking to trade fiat currency. The person providing the fiat currency generally charges a percentage of the transaction as their fee for services.

24. For the local trades, Localmonero.co allows users to create a profile and advertise their exchange rate and payment methods for buying or selling Monero and other virtual currencies. A person seeking to trade cash for Monero can then reply to these advertisers through the site and agree to meet in person to conduct the transaction. However, the majority of individuals advertising on Localmonero.co list a moniker they can be reached at though encrypted messaging applications.

**D.  POGOSIAN's Localmonero.co Trading Activity**

25. In February 2023, I began searching Localmonero.co for unlicensed money transmission businesses in San Diego, California that sold Monero for cash via the local trade platform.

26. One seller, identified with the moniker "MoneroLA," listed Monero for sale on Localmonero.co. MoneroLA advertised exchanges of Monero for cash at a premium exchange rate, with a purchase range from $100 - $1236.36, and an additional percentage transaction fee.

The advertisement stated that MoneroLA had five confirmed trades with a 100 percent feedback rating.  MoneroLA listed a moniker on the encrypted messaging service Telegram as @MoneroLA as its contact to schedule a purchase.

27.  As of May 30, 2023, MoneroLA's profile page on Localmonero.com advertised MoneroLA as available to sell Monero as follows:



28.  The foregoing online advertisement indicates that "MoneroLA" is actively advertising several exchange services and variations to facilitate the purchase of and or exchange of virtual currencies for Monero.

29.  According to the MoneroLA Localmonero.co profile, the MoneroLA account was created "3 months ago," indicating in February of 2023.  The account also has no less than five "confirmed trades".

30.  Although five trades were "confirmed," I believe that these only reflect trades made through the Localmonero.co trading

platform, or otherwise noted as "confirmed" by Localmonero.co users. Based on the undercover conversations and transactions with law enforcement discussed below, I believe that **POGOSIAN** and his co-conspirators do not confirm all trades made with persons they initially meet via Localmonero.co. For instance, none of the four trades **POGOSIAN** and his co-conspirator conducted with undercover law enforcement ended up being "confirmed" on Localmonero.co.

31. The profile and advertisement pages for MoneroLA on Localmonero.co have been actively managed. According to LocalMonero.co, MoneroLA was active or "seen just now" as of May 30, 2023.

32. The regular and consistent logins to the MoneroLA Localmonero.co profile and advertisement pages indicates the active operation of **POGOSIAN's** MTB, in that the value, trading limits, and availability of virtual currency are in constant flux.

**E.    Background on FinCEN Records and Reports**

33. As an HSI Special Agent, I have access to the FinCEN Portal. This is a database that maintains, among other records, the Department of Treasury FinCEN Form 104, a CTR, the Department of Treasury FinCEN Form 105, and registration information for MTBs/MSBs. Through the FinCEN Portal, my HSI colleagues and I can obtain information on how many CTRs are filed on an individual or business and by which financial institution. The FinCEN Portal also maintains registration records for every federally licensed MSB/MTB, as required under Title 31, United States Code, Section 5330. Law enforcement often use information contained on the FinCEN Portal to uncover and investigate a wide variety of illegal activities

including operation of an unlicensed MSB/MTB, tax evasion, narcotics trafficking, and money laundering.

34.  A CTR is the document a financial institution, including an MTB/MSB, prepares when a transaction exceeds $10,000 in cash and consists of four parts: (i) information concerning the account and account holder; (ii) personal information regarding the person conducting the currency transaction; (iii) the type and amount of the currency transaction, including the date and amount of the transaction; and (iv) the financial institution's information, including its name, address, tax identification number, and contact information.

35.  On several occasions, including on May 18, 2023, I searched the FinCEN Portal for records related to **POGOSIAN,** and the name of the MTB **POGOSIAN** operates: MoneroLA.  That search produced negative results for the registration of any federally licensed MTB/MSB.  The search did not produce any filing of CTRs in the past five years.

36.  On several occasions, including on May 18, 2023, I searched the FinCEN Portal for records related to **SCOTESE.**  That search produced negative results for registration of a federally licensed MTB/MSB.  The search did not produce any filing of CTRs in the past five years.

37.  Based on my training, experience, and knowledge of this case, large cash transactions at licensed financial institutions combined with the absence of CTRs within the last five years within FinCEN on **POGOSIAN** and **SCOTESE,** or the names used for their MTBs, provides probable cause to believe that the operation of the

unlicensed MTB is sophisticated and able to avoid BSA/AML compliance and scrutiny. The lack of CTR FinCEN reports at any financial institution suggests that the intent is to operate the MTB without complying with any federal BSA statutes, regulations, or best practices. **POGOSIAN** and **SCOTESE** have managed to operate unlicensed MTBs that evade all reporting compliance for their operations, and evade – for themselves, the businesses, and their customers – BSA/AML scrutiny by BSA-compliant institutions.

### F. POGOSIAN sells Monero to an HSI UC Without Registering as a Money Servicing Business

38. On February 21, 2023, an HSI Special Agent ("SA") sent an encrypted Telegram message to MoneroLA and asked to purchase Monero. MoneroLA responded by advising their availability sell Monero for cash at a four percent fee in Los Angeles or at eight percent in San Diego with a $12,000 transaction requirement. The SA agreed to the terms and coordinated an in-person meeting with MoneroLA. I have reviewed the messages between the SA and MoneroLA.

39. Two days later at approximately 11:55 a.m., **POGOSIAN** arrived at a café within the Southern District of California driving a 2021 Toyota Corolla bearing California License Plate 8WOJ883 ("**SUBJECT VEHICLE 1**") accompanied by an unknown female passenger.

40. **POGOSIAN** met with and introduced himself to an HSI undercover agent ("UC1") as "Leo". **POGOSIAN** asked UC1 why he needed Monero. UC1 indicated that he intended to move the virtual currency out of the United States to Mexico without scrutiny of law enforcement by being required to disclose the movement of currency across international boundaries. Furthermore, UC1 explained that

Monero is not as volatile as other virtual currencies, and the price does not fluctuate. **POGOSIAN** stated that, in an effort to avoid any KYC, UC1 should utilize the Trocador platform.[1]

41.   UC1 then provided $12,960 to **POGOSIAN**. **POGOSIAN** counted the money and confirmed the amount with UC1. **POGOSIAN** used his cellular phone to provide UC1 with $12,000 worth of Monero totaling 78.61798 Monero and transferred it to UC1's My Monero Wallet. POGOSIAN provided UC1 with a Monero transaction verification hash[2] from the MoneroLA moniker within the telegram encrypted messaging platform. After verifying receipt of the Monero from **POGOSIAN**, the UC left.

42.   **POGOSIAN** did not request any identifying information from the UC. As of May 18, 2023, **POGOSIAN** did not file a CTR documenting the transaction as required by law. **POGOSIAN** profited approximately $960 for the sale of Monero to UC1 – an approximately eight percent cut from the total purchase.

43.   During the meeting with UC1, **POGOSIAN** did not ask any KYC or AML compliance questions and did not request any personal identifiable information from the UC to formulate a CTR for the transaction being over the $10,000.00 limit.

---

[1] The Trocador platform is a partner of LocalMonero.co which is a service that enables users to find the best rates between different Exchange Platforms, while also providing improved privacy.

[2] A transaction hash is a way of uniquely identifying a transaction. The transaction hash can be decrypted through a ledger explorer to verify the amount of incoming funds and verify those funds were destined for your specific wallet address.

### G. Law Enforcement Databases Show POGOSIAN Resides at SUBJECT PREMISES 1

44. Upon the conclusion of the transaction, I searched law enforcement databases for information on **SUBJECT VEHICLE 1**. Based on those records, I learned that **SUBJECT VEHICLE 1** is registered to Karen Pogosian at 8059 Cherrystone Ave., in Panorama City, California 91402 ("**SUBJECT PREMISES 1**"). A search of law enforcement databases also revealed family associates of Karen Pogosian also resided at **SUBJECT PREMISES 1**. Levon **POGOSIAN** was listed as a family member of Karen Pogosian who resided at **SUBJECT PREMISES 1**.

45. Based on this and MoneroLa's introduction as "Leo", I was able to determine that the individual known as MoneroLA was Levon **POGOSIAN**. Specifically, HSI was able to physically identify **POGOSIAN** from his California DMV photograph. Furthermore, I provided UC1 POGOSIAN's California DMV Photograph and UC1 confirmed POGOSIAN was the individual he met with known as MoneroLA. DMV records list **POGOSIAN's** identifiers as Levon **POGOSIAN,** DOB 6/24/1995, address: 8059 Cherrystone Ave, Panorama City, California 91402 (i.e., **SUBJECT PREMISES 1**).

46. Law enforcement databases research on **POGOSIAN** further revealed **POGOSIAN** resided at both **SUBJECT PREMISES 1** and 8061 Cherrystone Avenue Panorama City, California 91402 interchangeably. Research of law enforcement databases regarding **SUBJECT PREMISES 1** lists **POGOSIAN** as the owner on parcel # 088-220-25 for the property information of the residential lot of 8059 Cherrystone Ave Panorama City, CA,

91402.  Law enforcement databases also indicate that **POGOSIAN**
utilizes 8061 Cherrystone Ave., Panorama City, CA, 91402 for
cell phone billing purposes.

47.  Based on my review of photographs of 8059 Cherrystone
Avenue, I discovered that 8061 Cherrystone Avenue is a separate
dwelling on the same lot of 8059 Cherrystone Avenue.  8061
Cherrystone Avenue is separated from the 8059 Cherrystone
Avenue's driveway by a white gate.

### H.  POGOSIAN sells more Monero to an HIS UC Without Registering as a Money Servicing Business

48.  On March 6, 2023, an HSI SA initiated a second Telegram
encrypted chat with MoneroLA to conduct a second Monero purchase.
MoneroLA stated he was available and he could fill any amount.  The
SA stated he needed to buy $50,000 worth of Monero.  MoneroLA agreed
and confirmed an eight percent fee to facilitate the exchange.

49.  On March 10, 2023, prior to the UC meet.  MoneroLA
notified the SA through Telegram encrypted chat that he may be late
to the meeting as he was having difficulties with his Trezor
device.[3]  A short time later, MoneroLA notified the SA through
Telegram encrypted chat that he had resolved the issue and would not
be delayed for the meeting.

50.  The same day, at approximately 11:35 a.m.**,** **POGOSIAN**
arrived at a café within the Southern District of California driving
**SUBJECT VEHICLE 1** and again accompanied by an unknown female.

---

[3] Based on my training and experience, I know that a Trezor
device is a virtual currency cold storage device similar to a
USB drive that holds an individual's cryptocurrency private
keys, encrypted in its flash memory. Devices of this nature are
utilized in conjunction with a computer to store private keys
needed to access cryptocurrency offline.

**POGOSIAN** approached and entered an HSI UC's car.  Once inside, **POGOSIAN** initiated a conversation with UC1.  During the recorded conversation, UC1 introduced **POGOSIAN** to a second UC ("UC2") who was inside the UC1's car.  UC1 informed **POGOSIAN** that he would be meeting with UC2 in the future due to pending foreign travel to Colombia.  **POGOSIAN** agreed to this arrangement.  UC1 informed **POGOSIAN** that higher transaction amounts were needed.  **POGOSIAN** agreed without hesitation.  UC1 then handed **POGOSIAN** $54,000 and allowed him to count it while inside the car.  **POGOSIAN** counted the money, confirmed the amount, and then transferred to UC1 $50,000 in Monero via **POGOSIAN's** cellphone cryptocurrency wallet. **POGOSIAN** and UC1 exited the UC's car while they waited for confirmation of the Monero transfer.  **POGOSIAN** provided UC1 with the Monero transaction verification hash through the telegram encrypted chat under the name MoneroLA.  The receipt showed **POGOSIAN** transferred 377.67626 Monero to UC1's Cake[4] wallet.

51.  **POGOSIAN** again did not request any identifying information from UC1 or UC2 prior to, during, or after the transaction.  As of May 18, 2023, **POGOSIAN** did not file a CTR documenting the transaction.  **POGOSIAN** profited approximately $4000.00 for the sale of Monero to UC1 - an approximate eight percent cut of the purchase.

52.  During the meeting with the UCs, **POGOSIAN** did not ask any KYC or AML compliance questions and did not request any personal identifiable information from the UCs to formulate a CTR for the

---

[4] Cake Wallet is a multi-chain cryptocurrency wallet designed to help individuals manage and conduct Monero, LiteCoin, and Bitcoin exchanges. Cake Wallet allows users to manage and backup multiple wallets and accounts locally or to the cloud.

transaction being over the $10,000.00 limit.

**I.   A Tracker Warrant Reveals SUBJECT VEHICLE 1 is
       Associated with SUBJECT PREMISES 1**

53.   On March 29, 2023, Southern District of California
Magistrate Judge David D. Leshner signed a tracker warrant
authorizing the installation and monitoring of a tracking device on
**SUBJECT VEHICLE 1** in Case No. 23-MC-613.

54.   The tracking device was installed on **SUBJECT VEHICLE 1** in
the parking lot of the café immediately prior to the third UC
purchase of Monero with **POGOSIAN** discussed below.

55.   The information obtained from the tracking device showed
that **SUBJECT VEHICLE 1** was last parked in a driveway behind a gate
separating **SUBJECT PREMISES 1** from the street on May 30, 2023.

**J.   POGOSIAN sells more Monero to an HSI UC**

56.   On March 24, 2023, an HSI SA initiated a third Telegram
encrypted chat with MoneroLA to conduct a third Monero purchase.
MoneroLA stated they were available and they were going to try and
fulfill a $100,000 transaction.  MoneroLA then confirmed the ability
to facilitate $100,000 but stated he would need to raise his fee to
12 percent.  When questioned as to the increased rate, MoneroLA
indicated that it was necessary due to market fluctuations and the
differing rates offered by sources of Monero.  MoneroLA and the UC
agreed to terms and a meeting was scheduled to take place on March
30, 2023.

57.   Prior to the meeting, MoneroLA notified the SA through
Telegram that he would be able to facilitate the transaction at a 10
percent fee.

58. On March 30, 2023, at approximately 11:15 a.m., **POGOSIAN** arrived at a café within the Southern District of California again driving **SUBJECT VEHICLE 1. POGOSIAN** was accompanied by an unknown male. **POGOSIAN** approached the UCs at a diner and engaged them in conversation while the unknown male stood in front of the diner acting as a lookout.

59. UC2 provided $110,000 to **POGOSIAN. POGOSIAN** then transferred $100,000.00 worth of Monero totaling 642.20566 Monero to UC2's Cake wallet. **POGOSIAN** provided UC2 with the Monero transaction verification hash through the telegram encrypted chat under the name MoneroLA.

60. **POGOSIAN** again did not request any identifying information from UC2. As of May 18, 2023, **POGOSIAN** did not file a CTR documenting the transaction. **POGOSIAN** profited approximately $10,000 for the sale of Monero to UC2 – an approximate 10-percent cut of the purchase.

61. Upon the conclusion of the transaction, HSI mobile surveillance was initiated on **POGOSIAN**. Through my conversations with HSI agents, I learned that **POGOSIAN** departed the meeting location using **SUBJECT VEHICLE 1** and drove to Murietta, California. **POGOSIAN** arrived at the Victory Park, Valley-Wide Recreation and Park District in Murietta California at approximately 1:40 p.m. **POGOSIAN** and the unknown man were observed waiting in **SUBJECT VEHICLE 1.** Approximately 15 minutes later, a white 2021 Tesla sedan bearing California license plate 8VIP470 (the "Tesla") arrived and parked next to **POGOSIAN. POGOSIAN** left **SUBJECT VEHICLE 1** and entered the Tesla. **POGOSIAN** remained inside the Tesla for

approximately 10 minutes before leaving. At approximately 2:25 p.m., the Tesla drove away from the park. Surveillance units were able to confirm two females within the front driver's seat and passenger seat of the Tesla. HSI SAs positively identified Kimberlee Scotese, SCOTESE's spouse, as the passenger inside the Tesla by reviewing her California driver's license photograph.

62. **POGOSIAN** re-entered **SUBJECT VEHICLE 1** and remained parked for approximately five more minutes before driving away.

63. During the meeting with the UCs, **POGOSIAN** did not ask any KYC or AML compliance questions and did not request any personal identifiable information from the UCs to formulate a CTR for the transaction being over the $10,000.00 limit.

**K.   POGOSIAN sells more Monero to an HSI UC Without Registering as a Money Servicing Business**

64. On April 7, 2023, an HSI SA initiated a fourth Telegram encrypted chat with MoneroLA to conduct a fourth Monero purchase. MoneroLA stated he was available and asked if the same terms from the previous meet were okay. The two agreed to terms and a meeting was scheduled to take place on April 14, 2023.

65. On April 14, 2023, at approximately 11:44 p.m., through Telegram encrypted messages, **POGOSIAN** notified the UCs that he had arrived at the meeting location. **POGOSIAN** was observed arriving at the location within the Southern District of California again driving **SUBJECT VEHICLE 1** with an unidentified female. UC2 responded that he was there. **POGOSIAN** approached UC2 location whereupon UC2, who was with a third HSI undercover agent ("UC3"), told **POGOSIAN** that he had the money for the Monero purchase in his

pickup truck. All three subjects walked to and entered the UC2's pickup truck. While inside the truck, UC2 gave **POGOSIAN** a plastic Ralphs grocery store plastic bag containing $110,000. **POGOSIAN** took the money and began counting it. **POGOSIAN** asked the UC's if the currency was all $100 bills.

66. After counting the money, **POGOSIAN** asked if he was sending the Monero cryptocurrency directly to UC1's wallet. UC2 explained that now all the transactions were going to be going to his (UC2) wallet. UC3 informed **POGOSIAN** that "UC1" was explaining the benefits of cryptocurrency to the people we work with. UC3 told **POGOSIAN** that the true owners of the money were located in Sinaloa and Mexico City, Mexico. UC3 explained that the owners of the money were "old guys" and were used to dealing with bulk cash and that cryptocurrency is a much safer way to move money. **POGOSIAN** agreed. UC2 also asked **POGOSIAN** if he has associates to pickup bulk cash currency from other cities within the United States. UC2 explained the inconvenience and hazards of picking up bulk cash from New York City, Las Vegas, and other cities. **POGOSIAN** agreed and stated that bulk cash could be mailed to him directly and he would then sell the Monero. **POGOSIAN** also stated that he would look for money couriers. UC2 reminded **POGOSIAN** to make sure he had his "tip" payment consisting of $10,000. **POGOSIAN** indicated that he had the money.

67. UC2 also told **POGOSIAN** that he would be making a larger purchase of Monero in about two weeks and asked if the fees were going to be eight percent because of the recurrent business. **POGOSIAN** indicated that he could do eight percent the following week but was not sure if he could provide an eight percent fee in two

weeks, but that he would try.  **POGOSIAN** used his cell phone to
transfer $100,000 in Monero currency totaling 614.23828 Monero to
UC2's Cake wallet.  **POGOSIAN** then sent UC2 transaction hash
confirmation using the Telegram handle MoneroLA.

68.  The following is a breakdown of the Virtual currency
transaction: UC2 provided $110,000.00 USD to **POGOSIAN** and UC2
received $100,000.00 in Monero from **POGOSIAN.**  UC2 received
614.23828 Monero from **POGOSIAN.**

69.  During the meeting with the UCs, **POGOSIAN** did not ask any
KYC or AML compliance questions and did not request any personal
identifiable information from the UCs to formulate a CTR for the
transaction being over the $10,000.00 limit.  As of May 18, 2023,
**POGOSIAN** did not file a CTR documenting the transaction as required
by law.

70.  Upon completion of the transaction, HSI SAs initiated
mobile surveillance of **POGOSIAN.**  From my conversations with the
SAs, I learned that **POGOSIAN** left the meeting location and again
proceeded to Murietta California using **SUBJECT VEHICLE 1.  POGOSIAN**
arrived at Victory Park, Valley-Wide Recreation and Park District in
Murietta California at approximately 1:45 p.m.  **POGOSIAN** and the
unidentified female were observed waiting in their vehicle at the
park.

71.  At approximately 1:45 p.m., I initiated surveillance
at **SUBJECT PREMISES 2.**  At 2:00 p.m., I observed **SCOTESE** leave
**SUBJECT PREMISES 2** in a Maroon 2013 Honda Accord bearing
California license plate 7DJD298 ("**SUBJECT VEHICLE 2**").  At
approximately 2:00 p.m., **SCOTESE** arrived at Victory Park and

24

parked next **SUBJECT VEHICLE 1**. **SCOTESE** left **SUBJECT VEHICLE 2**
and entered **SUBJECT VEHICLE 1**. **POGOSIAN** and SCOTESE remained
inside **SUBJECT VEHICLE 1** for approximately 20 minutes. Inside,
**SCOTESE** was observed counting money with **POGOSIAN** and talking
before leaving carrying the same bag the UCs had provided
**POGOSIAN** during Monero transaction earlier that day. **SCOTESE**
drove away from the park in **SUBJECT VEHICLE 2** and returned to
**SUBJECT PREMISES 2** approximately three minutes later. As he got
out of **SUBJECT VEHICLE 2, SCOTESE** was carrying the same bag
containing currency previously provided to **POGOSIAN** during the
transaction with the UCs. **SCOTESE** then entered **SUBJECT PREMISES
2** carrying the bag.

72. On May 18, 2023, I conducted a search of the FINCEN MSB
database. FINCEN does not list **POGOSIAN**, MoneroLA or **SUBJECT
PREMISES 1** as a registered Money Service Business.

**L.   SCOTESE Localmonero.co Trading Activity**

73. On April 22, 2023, I conducted a search of LocalMonero.co
to locate advertisements and activity associated to **SCOTESE**. This
search revealed a user with no visible account moniker or
identifiable account name. The account is listed as "User" and was
last active four months ago. The User account appears to have been
deactivated. The User account still has information regarding the
account, including its transaction history.

74. Based on my review of the User account's transaction
history, I learned that the User account had 3999 transactions with
a 99 percent positive trade history with trade limits of $500.00 to
$10,000.00. The User account had the terms of trade listed as: "if

you don't have cash (USD-COLD HARD CASH), please don't make a trade request.  If you do, lets meet in the parking lot at Victory Park, 34580 Strawberry Ridge Circle Murrieta, CA 92563.  Check my schedule and text, telegram, of signal me at (951)236-2719".

75.  A law enforcement database phone number search of the phone number (951)236-2719 reveals the number is an AT&T Mobile number with SCOTESE listed as the owner.

76.  The "check my schedule" is a hyper link (https://telegra.ph/Schedule-of-Dave-09-09) that takes you to a Telegram schedule titled "Schedule of Dave" created by "Dave" on September 08, 2021.  The schedule lists availability for coordinating a meet with times and instructions for each day of the week.  The schedule is ended with a PGP key titled "Dave's Public Key."



77.  On April 30, 2023, I engaged **SCOTESE** through the encrypted messaging application Signal associated with phone number 951-236-2719 to facilitate a fiat currency for cryptocurrency exchange.  Within Signal, the phone number 951-236-2719 was typed in and within Signal it autogenerated this contact as **SCOTESE**.  Based on my familiarity and usage of Signal, I know this would indicate that **SCOTESE** would have to attribute the number to his name within the profile of his Signal account from his phone.

78.  The same day, **SCOTESE** responded through Signal in agreement to my request for an in-person cryptocurrency transaction.  **SCOTESE** responded stating that his new username within LocalMonero.co was "LetterGuy21969."  **SCOTESE** stated that he still did in-person meets.  Communication between **SCOTESE** and I continued through May 4, 2023 and an in-person meeting was scheduled to take place on May 5, 2023.  **SCOTESE** agreed to exchange $60,000 worth of Monero to the UC in exchange for money at a four percent fee.  **SCOTESE** stated he would first facilitate a $10,000 transaction and then verify the currency at home before returning to do the remaining $50,000.

79.  A search of "LetterGuy21969" within LocalMonero.co revealed the account was active and created five months prior. The account had listed 124 prior trades with a 100 percent approval rating. The trade limits were listed at $500 to $10,000.  The account listed cash by mail as the only trading option stating: "you mail me cash and a note, I release after

verifying it."

80. According to my review of LocalMonero.co on May 30, 2023, "LetterGuy21969" was active or "seen just now".



**M. SCOTESE Sells Montero to an HSI UC Without Registering as a Money Servicing Business**

81. On May 5, 2023, HSI San Diego CPTF Group III set up an undercover operation in Murietta, California with **SCOTESE** to take place at 1:00 p.m., near Victory Park located at 30830 Silky Lupine Dr, Murrieta, CA 92563. This location is approximately two blocks away from **SUBJECT PREMISES 2**. At approximately 12:50 p.m., **SCOTESE** was observed by HSI SAs arriving at **SUBJECT PREMISES 2** driving **SUBJECT VEHICLE 2**. At the same time, **SCOTESE** notified a UC through Signal that he was on his way. **SCOTESE** briefly stopped at **SUBJECT PREMISES 2** before driving to Victory Park to meet with UCs.

82. At approximately 12:55 p.m., **SCOTESE** arrived at

Victory Park and met with UC2 and UC3. UC3 asked **SCOTESE** if he was "LetterGuy." **SCOTESE** said, "yeah I'm LetterGuy, Dave." UC3 asked SCOTESE if he wanted to do the transaction in UC3's car. **SCOTESE** agreed and sat in UC3's car along with UC2.

83. Inside, UC3 asked **SCOTESE** how he wanted to do the transaction because **SCOTESE** previously indicated that he wanted to verify the first $10,000 before doing the remaining $50,000.00. **SCOTESE** responded, "you wanted to do $60,000 can you show me $60,000.00". UC3 showed **SCOTESE** the full $60,000 in cash. **SCOTESE** stated he would exchange $10,000 first and verify the money at his home with his money counter before returning to do the remaining $50,000. **SCOTESE** stated he only lived four minutes away and would be back in ten minutes and as soon as the UC's received verification of the transaction. **SCOTESE** initiated the first transaction by scanning UC3's QR code on his phone and sending UC3 $9,615 worth of Monero totaling 61.06704 Monero. After approximately ten minutes, the initial transaction was verified in UC3's cryptocurrency wallet.

84. **SCOTESE** left the meeting location in **SUBJECT VEHICLE 2** and returned to **SUBJECT PREMISES 2**. After a brief period, SCOTESE left **SUBJECT PREMISES 2** and drove back to Victory Park using **SUBJECT VEHICLE 2.**

85. Once there, **SCOTESE** spoke with the UCs. UC3 informed SCOTESE that this was not their money and they had to send the entire remaining balance. UC3 provided **SCOTESE** with the remaining $50,000 in cash. **SCOTESE** said that he owed UC3 $48,076.92 as he was sending UC3 equivalent Monero minus his own

commission instead of charging commission on the full amount. **SCOTESE** then sent UC3 304.88744 Monero through his cellular phone.

86. During a subsequent conversation with **SCOTESE**, UC3 stated they were not comfortable sending money in the mail and **SCOTESE** responded it took him a while to become comfortable as well. UC3 explained that the drive from New York and Chicago to San Diego with bulk cash was difficult and that cryptocurrency was new to them but made it easier. **SCOTESE** was asked what the maximum amount he could handle. **SCOTESE** said it depends. UC3 stated he wanted to do transactions every two to three weeks. **SCOTESE** said that was fine. When asked if he could facilitate a $200,000 transaction, **SCOTESE** responded he would like to see the UCs more first and that $100,000 was the most in a single transaction he would be willing to do. **SCOTESE** noted that, "sometimes I feel that I'm too comfortable with this, doing such large amounts of money and it's going to hurt me someday."

87. **SCOTESE** sent the verification transaction hash to UC3 via Signal. **SCOTESE** explained the way he and his son-in-law worked things was that they were both in the same chat and they both would coordinate with the customer based on their availability. **SCOTESE** informed the UC's he would set up a chat with his son-in-law.

88. During the meeting with the UCs, **SCOTESE** did not ask any KYC or AML compliance questions and did not request any personal identifiable information from the UC to formulate a CTR for the transaction being over the $10,000 limit. On May 18,

2023, I conducted a search of the FINCEN MSB database. FINCEN does not list **SCOTESE** or **SUBJECT PREMISES 2** as a registered Money Service Business.

### N.    SCOTESE's Indictment

89.    On May 31, 2023, a Grand Jury in the Eastern District of New York sitting in Brooklyn, New York indicted **SCOTESE** on a two-count sealed indictment charging **SCOTESE** with violating 18 U.S.C. § 1960 and 18 U.S.C. § 1956(a)(3)(B), together with other related conduct in sealed Case No. 23-CR-231.

### O.    POGOSIAN's Indictment

90.    On June 6, 2023, a Grand Jury in the Southern District of California sitting in San Diego indicted **POGOSIAN** on a one count sealed indictment charging **POGOSIAN** with violating 18 U.S.C. § 1960 for the conduct outlined above in Case No. 22-CR-1099-RBM.

## V.    <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[5]

89.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

90.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

     a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

91. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

     a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **POGOSIAN** and/or **SCOTESE's** thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **POGOSIAN** and/or **SCOTESE's** face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    92.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. TRAINING AND EXPERIENCE ON VIRUTAL CURRENCY AND ENCRYPTION

    93.  Based on my training and experience, I know that individuals involved in fraudulent activities often maintain records (including financial records, receipts, notes, ledgers, mail, tax records, and other papers) related to their crimes, and that these records are often maintained at places where the individuals can have ready access to them, including their residence.  In my training and experience, I also know that individuals who have committed crimes using computers or digital devices, such as **POGOSIAN** and **SCOTESE**, often keep records of their crimes in digital or electronic format, such as on a computer, and that computers are often stored in a residence.

    94.  It should be noted that because **POGOSIAN** and **SCOTESE's** crimes involved the use of virtual currency and encryption, the items to be seized could be stored almost anywhere within a residence, in both physical and electronic formats.  For example, Attachment B seeks crypto- and virtual currency

addresses, private keys, root keys, PGP keys, and passwords.
These pieces of data comprise long and complex character
strings, and in my training and experience I know that many
virtual currency users write down or otherwise record and store
such items because they are too long to commit to memory.  As
such, these keys, passwords, and addresses may be documented in
writing and secreted anywhere within a residence.  For all of
the foregoing reasons, your affiant respectfully submits that
probable cause exists to believe that such records, data, and
documents will be found within **POGOSIAN** and **SCOTESE's** residence,
including in computers or on other devices that store electronic
data.

## VII. <u>CONCLUSION</u>

95.  For all the reasons described above, there is probable
cause to believe that the items listed in Attachment B, which
constitute evidence, fruits, and instrumentalities of violations
of the Subject Offenses will be found at and in the **SUBJECT
PREMISES**, as described in Attachments A-1 through A-2, and in
the **SUBJECT VEHICLES**, as described in Attachments A-3 through A-
4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 7th day of June,
2023.

_____
UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR